REVISED OCTOBER 2, 2008
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

F I L E D

September 29, 2008

Charles R. Fulbruge III

Clerk

No. 06-30262

SAFETY NATIONAL CASUALTY CORPORATION,

Plaintiff–Appellee,

LOUISIANA SAFETY ASSOCIATION OF TIMBERMEN–SELF INSURERS
FUND,

Intervenor Plaintiff–Appellee,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON; ET AL.,

Defendants,

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

Defendant–Appellant.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

Plaintiff–Appellant,

v.

SAFETY NATIONAL CASUALTY CORPORATION; LOUISIANA SAFETY
ASSOCIATION OF TIMBERMEN,

Defendant–Appellee.

No. 06-30262

---

Appeal from the United States District Court
for the Middle District of Louisiana
No. 02-W-1146-A
No. 05-W-262-A

---

Before KING, DeMOSS, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

The basis for this interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is the district court's denial of a motion to compel arbitration of a contractual dispute among three insurers. The district court concluded that because of the McCarran–Ferguson Act,[1] the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention)[2] and federal legislation providing that the Convention shall be enforced in United States courts, found in 9 U.S.C. §§ 201-208, are reverse preempted by LA. REV. STAT. ANN. § 22:629. We disagree.

I

Louisiana Safety Association of Timbermen–Self Insurers Fund (LSAT) is, as its name implies, a self-insurance fund operating in Louisiana. It provided workers' compensation insurance for its members. Certain Underwriters at Lloyd's, London (the Underwriters) provided excess insurance to LSAT by reinsuring claims for occupational-injury occurrences that exceeded the amount of LSAT's self-insurance retention. Each reinsurance agreement contained an arbitration provision.

---

[1] 15 U.S.C. § 1011.

[2] June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

2

Safety National Casualty Corporation (Safety National) also provides excess workers' compensation coverage and alleges that in a loss portfolio transfer agreement, LSAT assigned its rights under the reinsurance agreements with the Underwriters to Safety National. The Underwriters refused to recognize the assignment, contending that LSAT's obligations were strictly personal and therefore non-assignable.

Safety National sued the Underwriters in federal district court. The Underwriters filed an unopposed motion to stay proceedings and compel arbitration. The district court initially granted that motion and stayed the lawsuit.

The Underwriters initiated arbitration proceedings with Safety National and LSAT; however, the parties could not agree upon how arbitrators were to be selected. The Underwriters then filed a motion to lift the stay in order to join LSAT as a party in the district court and to compel arbitration to resolve the dispute about how to compose the arbitration panel. In response, LSAT moved to intervene, lift the stay, and quash arbitration. LSAT asserted that the arbitration agreements were unenforceable under Louisiana law. While those motions were pending, the Underwriters filed a separate action against Safety National and LSAT seeking recovery of unpaid premiums under the policies. The district court consolidated the two actions.

The district court ultimately reconsidered its initial decision and granted LSAT's motion to quash arbitration. The district court concluded that although the Convention would otherwise require arbitration, a Louisiana statute[3] that has been interpreted to prohibit arbitration agreements in insurance contracts was controlling. The district court reasoned that since that statute had "the purpose of regulating the business of insurance" within the meaning of the

---

[3] LA. REV. STAT. ANN. § 22:629.

McCarran–Ferguson Act, the Louisiana statute reverse preempted the Convention.[4] The district court subsequently certified that its order embodying these rulings involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal pursuant to 28 U.S.C. § 1292(b) may materially advance the termination of the litigation. We granted leave to appeal.

II

The Louisiana statute at issue provides:

A. No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state . . . shall contain any condition, stipulation, or agreement:

. . . .

(2) Depriving the courts of this state of the jurisdiction of action against the insurer.

. . . .

C. Any such condition, stipulation, or agreement in violation of this Section shall be void, but such voiding shall not affect the validity of the other provisions of the contract.[5]

Although it is not clear from this provision's text that arbitration agreements are voided, Louisiana courts have held that such agreements are unenforceable because of this statute.[6]

---

[4] See generally U.S. Dept. of Treasury v. Fabe, 508 U.S. 491, 507 (1993) ("Ordinarily, a federal law supersedes any inconsistent state law. The first clause of [§ 1012(b)] reverses this by imposing what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise.").

[5] LA. REV. STAT. ANN. § 22:629.

[6] See Doucet v. Dental Health Plans Mgmt. Corp., 412 So. 2d 1383, 1384 (La. 1982) ("Classification of the contract at issue as an insurance contract renders the arbitration provisions of that contract unenforceable under R.S. 22:629."); see also McDermott Int'l, Inc. v. Lloyds Underwriters of London, 120 F.3d 583, 586 (5th Cir. 1997) ("Compulsory arbitration

The McCarran–Ferguson Act provides that "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."[7] The Act further provides, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ."[8]

The Convention does not specifically relate to the business of insurance. Nor do Underwriters challenge the district court's conclusion that LA. REV. STAT. ANN. § 22:629, when applied to disputes arising under reinsurance agreements between insurers, regulates the business of insurance within the meaning of the McCarran–Ferguson Act.[9] Accordingly, we will assume, without deciding, that the Louisiana statute does regulate the business of insurance, although the matter is not entirely free from doubt. One of the criteria for determining whether a law regulates the business of insurance is whether it has the effect of spreading or transferring a policyholder's risk.[10] The Supreme Court has

---

clauses in certain insurance contracts are unenforceable in Louisiana because of La.R.S. 22:629 . . . ."); W. of Eng. Ship Owners Mut. Ins. Ass'n (Luxembourg) v. Am. Marine Corp., 981 F.2d 749, 750 n.5 (5th Cir. 1993) ("Louisiana has prohibited arbitration clauses in insurance policies" (citing LA. REV. STAT. ANN. § 22:629; Doucet, 412 So. 2d at 1384)).

[7] 15 U.S.C. § 1011.

[8] Id. § 1012(b); see also id. §1101; Fabe, 508 U.S. at 507 (explaining that the first clause of [§ 1012(b)] mandates that state statutes "regulating the business of insurance" do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise).

[9] 15 U.S.C. § 1012(b).

[10] See Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982) (explaining that "three criteria relevant in determining whether a particular practice is part of the 'business of insurance'" include "whether the practice has the effect of transferring or spreading a

emphasized that arbitration agreements are forum-selection provisions and do not displace substantive rights afforded by a statute or other substantive law.[11] An argument could be made that at least in theory, resolving claims in an arbitration rather than in a court before a jury does not substantially affect the risk pooling arrangement between the insurer and the insured. However, this court has held in American Bankers Insurance Co. of Florida v. Inman that the Federal Arbitration Act[12] was reverse preempted by the McCarran–Ferguson Act in the context of a dispute between an injured insured and his insurer regarding underinsured-motorist coverage governed by Mississippi law.[13] Therefore, this issue is foreclosed in this circuit and in any event is not before us.

The Underwriters set forth three issues: whether (1) the Convention on the Recognition and Enforcement of Foreign Arbitral Awards is an "Act of Congress" within the meaning of the McCarran–Ferguson Act,[14] (2) the McCarran–Ferguson Act applies to international commercial transactions, and (3) the Convention takes precedence over the McCarran–Ferguson Act even if the latter applies to international transactions. For the reasons we consider

---

policyholder's risk," although "[n]one of these three criteria is necessarily determinative in itself"); cf. Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 338 (2003) (explaining, albeit in the context of ERISA, "that conditions on the right to engage in the business of insurance must also substantially affect the risk pooling arrangement between the insurer and the insured").

[11] See, e.g., Preston v. Ferrer, 128 S. Ct. 978, 987 (2008) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral . . . forum." (omission in original) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985))).

[12] 9 U.S.C. § 1 et seq.

[13] See 436 F.3d 490, 494 (5th Cir. 2006) (holding that a state law prohibiting "required arbitration of disputes stemming from the uninsured motorist coverage provisions . . . regulates risk by subjecting all [such] policy disputes . . . to the possibility of a jury trial").

[14] 15 U.S.C. § 1012(b) ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance. . . .").

6

below, we are persuaded that Congress did not intend to include treaties within the scope of an "Act of Congress" when it used those words in the McCarran–Ferguson Act, and we therefore do not reach other issues pressed by the Underwriters.

## III

LSAT contends that treaties stand on equal footing with acts of Congress, the Convention was not self-executing and could only have effect in the courts of this country when Congress passed enabling legislation, and therefore, the Convention's enabling legislation is the equivalent of an "Act of Congress" within the meaning of the McCarran–Ferguson Act. LSAT is correct that an act of Congress is on full parity with a treaty.[15] "'[W]hen a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.'"[16] The Underwriters maintain that the Convention was ratified after the McCarran–Ferguson Act was enacted and that in any event, the Convention is self-executing, which means that it did not require an act of Congress to have effect in United States courts. The Underwriters assert that a "later-in-time self-executing treaty supercedes a federal statute if there is a conflict."[17] The Convention is not an act of Congress, the Underwriters

---

[15] Reid v. Covert, 354 U.S. 1, 18 (1957) (plurality opinion) ("[An] Act of Congress . . . is on a full parity with a treaty . . . ."); Breard v. Greene, 523 U.S. 371, 376 (1998) (per curiam) (same) (quoting Reid, 354 U.S. at 18); see also Egle v. Egle, 715 F.2d 999, 1013 (5th Cir. 1983) ("Under our Constitution, treaties and statutes are equal in dignity. If a treaty and a statute are inconsistent, 'the one last in date will control the other . . . .'" (omission in original) (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888))).

[16] Breard, 523 U.S. at 376 (quoting Reid, 354 U.S. at 18); see also Medellín v. Texas, 128 S. Ct. 1346, 1359 n.6 (2008) ("[A] later-in-time federal statute supersedes inconsistent treaty provisions.").

[17] Medellín, 128 S. Ct. at 1364 (citing Cook v. United States, 288 U.S. 102, 119 (1933)).

alternatively contend, even if the Convention was not self-executing, because a treaty is more than an act of Congress.

It is unclear whether the Convention is self-executing. The Supreme Court's recent decision in Medellin v. Texas instructs that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text."[18] In Medellin, the Court examined the Vienna Convention on Consular Relations[19] and the Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention[20] to determine whether a judgment of the International Court of Justice (ICJ) was "directly enforceable as domestic law in a state court in the United States."[21] The United States had agreed to submit disputes arising out of the Vienna Convention to the ICJ, but the Supreme Court recognized that "submitting to jurisdiction and agreeing to be bound are two different things."[22] The Court observed that the Optional Protocol "says nothing about the effect of an ICJ decision and does not itself commit signatories to comply with an ICJ judgment."[23] The Court went on to consider any obligations imposed by Article 94 of the United Nations Charter, finding that it also "does not provide that the United States 'shall' or 'must' comply with an ICJ decision, nor indicate that the Senate that ratified the U.N. Charter intended to vest ICJ decisions with immediate legal effect in domestic courts."[24] By contrast, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards

---

[18] Id. at 1357.

[19] Apr. 24, 1963, 1970 21 U.S.T. 77, 596 U.N.T.S. 261.

[20] Apr. 24, 1963, 1970 21 U.S.T. 325, 596 U.N.T.S. 487.

[21] Medellin, 128 S. Ct. at 1353.

[22] Id. at 1358.

[23] Id.

[24] Id.

expressly states that courts "shall" compel arbitration when requested by a party to an international arbitration agreement:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.[25]

The Convention additionally sets forth at least some procedures to be followed in obtaining enforcement of an arbitration award.[26] However, the Supreme Court indicated in dicta in Medellin that at least the provisions of the Convention pertaining to the enforcement of judgments of international arbitration tribunals are not self-executing.[27] This reference in Medellin could be read to imply that the Convention in its entirety is not self-executing, although such a conclusion cannot be drawn with any certainty from the brief discussion in the Court's opinion.

But even if the Convention required legislation to implement it in United States courts, that does not mean that Congress intended an "Act of Congress," as that phrase is used in the McCarran–Ferguson Act, to include a treaty. Implementing legislation does not replace or displace a treaty. A treaty remains something more than an act of Congress. It is an international agreement or

---

[25] Art. II(3), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38.

[26] See id. arts. III, IV.

[27] See Medellin, 128 S. Ct. at 1366 ("Congress is up to the task of implementing non-self-executing treaties, even those involving complex commercial disputes. The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress. [citing 9 U.S.C. §§ 201-208] . . . Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result." (citation omitted)); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974) (observing, although not in the context of whether the Convention was self-executing, "Congress passed Chapter 2 of the United States Arbitration Act in order to implement the Convention" (citation omitted)).

contract negotiated by the Executive Branch and ratified by the Senate,[28] not Congress. The fact that a treaty stands on equal footing with legislation when implemented by Congress does not mean that it ceases to be a treaty and becomes an "Act of Congress."

The Supreme Court has indicated that the preemptive reach of the McCarran–Ferguson Act was not intended to extend to the conduct of foreign affairs. The Supreme Court considered in American Insurance Ass'n v. Garamendi whether a state law, aimed at aiding Holocaust victims by requiring insurers to disclose information about insurance policies sold in Europe before and during World War II, interfered with the Federal Government's conduct of foreign relations.[29] The President of the United States had entered into an executive agreement with Germany's chancellor in which the United States agreed that whenever a German company was sued in an American court regarding a Holocaust-era claim, the United States government would submit a statement that "it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II."[30] This and other executive agreements regarding Holocaust claims had not been ratified as treaties by the United States Senate but were instead acts solely of the Executive Branch. The Supreme Court observed that "[g]enerally, . . . valid executive agreements are fit to preempt state law, just as treaties are, and if the agreements here had expressly preempted laws like [California's law], the issue would be

---

[28] See U.S. CONST. art. II § 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . .").

[29] Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 401 (2003).

[30] Id. at 406.

straightforward."[31] The Court ultimately concluded that the state law conflicted with Presidential foreign policy as expressed in executive agreements with foreign nations and was preempted.[32] In addressing California's argument that in the McCarran–Ferguson Act "Congress authorized state laws of [the] sort [California had enacted]," the Court said,

> As the text itself makes clear, the point of McCarran–Ferguson's legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption under the commerce power, whether dormant or exercised . . . . [A] federal statute directed to implied preemption by domestic commerce legislation cannot sensibly be construed to address preemption by executive conduct in foreign affairs.[33]

We think it unlikely that when Congress crafted the McCarran–Ferguson Act, it intended any future treaty implemented by an act of Congress to be abrogated to the extent that treaty conflicted in some way with a state law regulating the business of insurance if Congress's implementing legislation did not expressly save the treaty from reverse preemption by state law. If this had been Congress's intent, it seems probable that Congress would have included "or any treaty requiring congressional implementation" or similar language following "Act of Congress" and "such Act" when it said, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."[34] There is no indication in the McCarran–Ferguson Act that Congress intended, through the preemption provision and the use of the term "Act of Congress," to restrict the United States'

---

[31] Id. at 416-17.

[32] Id. at 420-26.

[33] Id. at 427-28.

[34] 15 U.S.C. § 1012(b).

ability to negotiate and implement a treaty that might affect some aspect of international insurance agreements in the same way that other international agreements would be affected by the terms of the treaty. If that were Congress's intent, it would seem, as we have said, that Congress would have more clearly articulated its design.

Most importantly, there is no apparent reason why Congress would have chosen to distinguish in the McCarran–Ferguson Act between treaties that are self-executing and those that are not. It is undisputed that if the provisions in the Convention directing courts to enforce international arbitration agreements were self-executing, then the McCarran–Ferguson Act would have no preemptive effect because self-executing treaties are not an "Act of Congress." No rationale has been offered by anyone as to why Congress would have intended to include a treaty that requires implementation by Congress within the reach of the McCarran–Ferguson Act's reverse preemption provisions but not self-executing treaties.

We are aware that the Second Circuit has held that "the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation."[35] As a consequence, the Second Circuit held Congress's "implementing legislation [did] not preempt"[36] a Kentucky statute that "subordinated" all "choice of law or arbitration provisions" in a contract to which an insolvent insurer in liquidation proceedings was a party.[37] The court reasoned that "when the terms of [a treaty] import a contract—when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the

---

[35] Stephens v. Am. Int'l Ins. Co., 66 F.3d 41, 45 (2d Cir. 1995).

[36] Id.

[37] Id. at 43.

12

contract, before it can become a rule for the court."[38]  The court then quoted the "[n]o Act of Congress" provision in the McCarran–Ferguson Act and said, "[a]ccordingly, the implementing legislation does not preempt the Kentucky Liquidation Act . . . ."[39]

We agree, of course, that when provisions of a treaty are not self-executing, they cannot be enforced in a court in this country unless and until those provisions are implemented by Congress.  But, we submit, this does not answer the question of what Congress intended when it used the terms "[n]o Act of Congress" and "such Act" in 1945 or why Congress would have addressed only treaties that required implementation by Congress.  The text of the McCarran–Ferguson Act does not support the inclusion by implication of "a treaty implemented by an Act of Congress."  Because we give the phrases "Act of Congress" and "such Act" their usual, commonly understood meaning, we conclude that treaties, self-executing or not, are not reverse preempted by the McCarran–Ferguson Act.

The Supreme Court's decision in Missouri v. Holland[40] reflects that a treaty followed by implementing legislation, may accomplish more than either treaty or an Act of Congress, standing alone.  The United States had consummated a treaty with Great Britain to protect migratory birds, and the treaty stated that "the two powers would take or propose to their lawmaking bodies the necessary measures for carrying the treaty out."[41]  Accordingly, the treaty was not self-executing. An act was passed giving effect to the Convention, directing the Secretary of Agriculture to promulgate regulations and prohibiting

---

[38] Id. at 45.

[39] Id.

[40] 252 U.S. 416 (1920).

[41] Id. at 431.

the killing of migratory birds except as permitted by regulations compatible with the treaty.[42] The State of Missouri sought to prohibit the enforcement of the Migratory Bird Treaty Act and the Secretary's regulations, arguing that the statute interfered with rights reserved to the States by the Tenth Amendment.[43]

The Supreme Court recognized a difference between acts of Congress and "a treaty followed by such an act."[44] It observed that "[a]n earlier act of Congress that attempted by itself and not in pursuance of a treaty to regulate the killing of migratory birds within the States had been held bad . . . ."[45] The Court said, "[w]hether the two cases cited [holding the prior Acts of Congress "bad"] were decided rightly or not they cannot be accepted as a test of the treaty power. Acts of Congress are the supreme law of the land only when made in pursuance of the Constitution, while treaties are declared to be so when made under the authority of the United States."[46] The Court continued, "[w]e do not mean to imply that there are no qualifications to the treaty-making power; but they must be ascertained in a different way. It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could . . . ."[47] The Supreme Court ultimately concluded "that the treaty and statute must be upheld."[48]

In the present case, as in Holland, the treaty followed by the implementing legislation, must be considered as the sum of its parts, not

---

[42] Id. at 431-32.

[43] Id. at 430-31.

[44] Id. at 433.

[45] Id. at 432.

[46] Id. at 433.

[47] Id.

[48] Id. at 435.

14

piecemeal, in determining what Congress meant when it used the words "Act of Congress" and "such Act" in the McCarran–Ferguson Act.

Our focus on congressional intent and the conclusion that referral to arbitration is required in this case is reinforced by the Supreme Court's analysis in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,[49] although the McCarran–Ferguson Act was not implicated in that case. The question was the "arbitrability, pursuant to the Federal Arbitration Act and the [Convention], of claims arising under the Sherman Act and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction."[50] The Court held such claims were arbitrable.[51] But in the process, the Supreme Court explained that "not . . . all controversies implicating statutory rights are suitable for arbitration."[52] In determining which are not, the Court said "[j]ust as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable."[53] Importantly, the Court said, "[w]e must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history."[54]

---

[49] 473 U.S. 614 (1985).

[50] Id. at 616 (citations omitted).

[51] Id. at 626-27.

[52] Id. at 627.

[53] Id. (emphasis added).

[54] Id. at 628.

Later in the Mitsubishi decision, the Supreme Court observed that "[t]he Convention reserves to each signatory country the right to refuse enforcement of an award where the 'recognition or enforcement of the award would be contrary to the public policy of that country.'"[55] The Court also noted that "Art. II(1) of the Convention, which requires the recognition of agreements to arbitrate that involve 'subject matter capable of settlement by arbitration,' contemplates exceptions to arbitrability grounded in domestic law."[56] "Yet in implementing the Convention by amendment to the Federal Arbitration Act, Congress did not specify any matters it intended to exclude from its scope."[57] "Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention."[58] But the Court "decline[d] to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so."[59]

The question, then, is whether the use of "no Act of Congress" and "such Act" in the McCarran–Ferguson Act is an express direction by Congress that a treaty such as the Convention is preempted to the extent it "invalidate[s], impair[s], or supersede[s]"[60] a state law that renders arbitration clauses unenforceable. For the reasons considered above, the text and context of the

---

[55] Id. at 638 (quoting Convention on Recognition and Enforcement of Foreign Arbitral Awards art. V(2)(b), June 10, 1958, 21 U.S.T 2517, 330 U.N.T.S. 3).

[56] Id. at 639 n.21 ("And it appears that before acceding to the Convention the Senate was advised by a State Department memorandum that the Convention provided for such exceptions.").

[57] Id.

[58] Id.

[59] Id. (emphasis added).

[60] 15 U.S.C. § 1012(b).

McCarran–Ferguson Act compel us to conclude that it contains no such express congressional direction.

The McCarran–Ferguson Act embodies a strong policy that the states have an interest in the regulation of the business of insurance. A reinsurance contract that has the potential to affect policyholders within a state unquestionably relates to the business of insurance. But concerns that a state's regulatory policies regarding such contracts may not be recognized in an international arbitration are ameliorated by provisions in the Convention and are not a basis for refusing to require that an arbitration go forward. The Supreme Court explained in Mitsubishi, in the context of federal antitrust law, that "[h]aving permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed."[61] As already noted, the Court recognized, "[t]he Convention reserves to each signatory country the right to refuse enforcement of an award where the 'recognition or enforcement of the award would be contrary to the public policy of that country.'"[62] The Court observed '[w]hile the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them."[63] The same is true of any Louisiana laws that apply to the reinsurance agreements presently at issue.

The Supreme Court emphasized in Mitsubishi that "[a]s international trade has expanded in recent decades, so too has the use of international

---

[61] Mitsubishi, 473 U.S. at 638.

[62] Id. (quoting Convention on Recognition and Enforcement of Foreign Arbitral Awards art. V(2)(b), June 10, 1958, 21 U.S.T 2517, 330 U.N.T.S. 3).

[63] Id.

arbitration to resolve disputes arising in the course of that trade."[64] The Court admonished:

> If they are to take a central place in the international legal order, national courts will need to "shake off the old judicial hostility to arbitration," and also their customary and understandable unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal. To this extent, at least, it will be necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration.[65]

We note that as ratified by the United States, the Convention applies "only to differences arising out of legal relationships . . . which are considered as commercial under the national law of the State" ratifying or acceding to the Convention.[66] There is no doubt that the present dispute among three insurers arises out of legal relationships that are commercial. We are not called upon to explore the outer bounds of what "commercial" legal relationships may encompass.

In sum, the McCarran–Ferguson Act does not cause LA. REV. STAT. ANN. § 22:629 to reverse preempt the Convention with regard to the dispute before us.

IV

We finally consider Safety National's request that we affirm the district court's ruling that the rights under the policies are assignable. The order embodying that ruling, dated August 13, 2003, has not been certified by the

---

[64] Id.

[65] Id. at 638-39 (quoting Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 985 (2d Cir. 1942)).

[66] Art. I(3), 21 U.S.T., at 2561 n.3.

district court under 28 U.S.C. § 1292(b). We therefore lack appellate jurisdiction to consider it.[67]

*   *   *

We REVERSE the district court's denial of the motion to compel arbitration and remand for further proceedings consistent with this opinion.

---

[67] See Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205 (1996) ("The court of appeals may not reach beyond the certified order to address other orders made in the case.").