# IN THE SUPREME COURT OF TEXAS

No. 18-0216

TEXAS MUTUAL INSURANCE COMPANY, HARTFORD UNDERWRITERS INSURANCE COMPANY, TASB RISK MANAGEMENT FUND, TRANSPORTATION INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, TWIN CITY FIRE INSURANCE COMPANY, VALLEY FORGE INSURANCE COMPANY, ET AL., PETITIONERS,

v.

PHI AIR MEDICAL, LLC, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

JUSTICE BLAND, joined by JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE BLACKLOCK, concurring.

The Texas Workers' Compensation Act "directly regulate[s] the 'business of insurance' by prescribing the terms of the insurance contract" and the parties' performance of those terms.[1] The Act obligates insurance carriers to directly remit payments to policy claimants according to state-prescribed insurance policies. This dispute centers on the Act's mandated claim process for one such policy claimant—an air-ambulance service.

---

[1] *See U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 502–03 (1993); *see also Fredericksburg Care Co. v. Perez*, 461 S.W.3d 513, 522 (Tex. 2015) ("Examples of practices that fall within the scope of [the business of insurance] include . . . . the writing of insurance contracts and the actual performance of those contracts.").

The McCarran–Ferguson Act is a federal law that insulates state insurance laws from federal preemption. Because the Texas Legislature enacted the Workers' Compensation Act "for the purpose of regulating the business of insurance,"[2] McCarran–Ferguson saves the challenged provisions from federal preemption. The court of appeals concluded otherwise. Accordingly, I concur in reversing its judgment.

## I

McCarran–Ferguson saves from preemption any state law enacted "for the purpose of regulating the business of insurance":

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.[3]

Congress enacted McCarran–Ferguson to address the concern that federal preemption had made "inroads . . . on the tradition of state regulation of insurance."[4] It "was an attempt . . . to assure that

---

[2] 15 U.S.C. § 1012(b). *See* TEX. LAB. CODE § 402.021(a)(3) (providing that one of "the basic goals of the workers' compensation system" is that "each injured employee shall have access to prompt, high-quality medical care within the framework established by this subtitle"), (b)(8) (stating that system participants "include insurance carriers" and "health care providers," which must abide by its laws and regulations).

[3] 15 U.S.C. § 1012(b). McCarran–Ferguson is divided into two clauses—the second clause deals with antitrust matters and is relevant here only to the extent that it informs our reading of the first clause. *See Fredericksburg*, 461 S.W.3d at 518.

[4] *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 458 (1969). McCarran–Ferguson was enacted after the Supreme Court's decision in *United States v. South-Eastern Underwriters Ass'n*, in which the Court held that Congress had power under the Commerce Clause to regulate insurance transactions stretching across state lines. 322 U.S. 533, 552–53 (1944). "Prior to that decision, it had been assumed that '[i]ssuing a policy of insurance [was] not a transaction of commerce,' subject to federal regulation." *Fabe*, 508 U.S. at 499 (first alteration in original) (citation omitted). Before *South-Eastern Underwriters*, "the States enjoyed a virtually exclusive domain over the insurance industry." *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 539 (1978)).

the activities of insurance companies in dealing with their policyholders would remain subject to state regulation."[5] As the Supreme Court has recognized, "Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance."[6] Thus, McCarran–Ferguson is a "reverse-preemption" statute.[7]

McCarran–Ferguson precludes preemptive application of a federal statute if "(1) the federal statute does not specifically relate to the 'business of insurance,' (2) the state law was enacted for the 'purpose of regulating the business of insurance,' and (3) the federal statute operates to 'invalidate, impair, or supersede' the state law."[8] Only the second element is in dispute in this case. Thus, we examine whether the Texas Legislature enacted the Texas Workers' Compensation Act "for the purpose of regulating the business of insurance," such that McCarran–Ferguson protects its insurance-reimbursement provisions from federal encroachment.

## II

### A

"[D]etermining a state's purpose in enacting a law is fundamental to . . . [McCarran–Ferguson's] inquiry."[9] Under our "well-established rules for discerning a statute's

---

[5] *Nat'l Sec., Inc.*, 393 U.S. at 459; *see Fabe*, 508 U.S. at 500 ("Congress moved quickly to restore the supremacy of the States in the realm of insurance regulation.").

[6] *Nat'l Sec., Inc.*, 393 U.S. at 458 (quoting *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429 (1946)); *see Fabe*, 508 U.S. at 505 ("[T]he first clause of § 2(b) was intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance.").

[7] *Ante* at __; *see Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 543 F.3d 744, 748 (5th Cir. 2008).

[8] *Fredericksburg*, 461 S.W.3d at 518–19 (quoting *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998)).

[9] *Id.* at 520.

purpose, . . . '[w]e determine legislative intent from the entire act and not just isolated portions.'"[10]

Thus, we consider the Texas Workers' Compensation Act as a whole, together with the position and role of the challenged provisions found within it.[11]

In *SEC v. National Securities, Inc.*, the Supreme Court recognized that state laws that govern "the type of policy" together with "its reliability, interpretation, and enforcement" constitute "core" insurance activities:

> Congress was concerned with the type of state regulation that centers around the contract of insurance. . . . The relationship between insurer and insured, the type of policy which c[an] be issued, its reliability, interpretation, and enforcement—these [are] the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to[o] must be placed in the same class.[12]

Thus, "[s]tatutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance.'"[13]

*United States Department of Treasury v. Fabe* is the key case that examines McCarran–Ferguson's first clause, which is "intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance."[14] In *Fabe*, the Court considered whether an Ohio claim-priority statute governing bankrupt insurers' obligations was enacted "for

---

[10] *Id.* (alteration in original) (quoting *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008)).

[11] *See* TEX. LAB. CODE § 413.011 (reimbursement guidelines and protocols); 28 TEX. ADMIN. CODE §§ 134.1 (medical reimbursement), .203 (medical fee guideline for professional services); *Fredericksburg*, 461 S.W.3d at 525 ("Because the test to determine whether laws are enacted for the purpose of regulating the business of insurance is broad, it is possible that a law, in its entirety, would fail to qualify for [McCarran–Ferguson's] exemption from preemption, but a specific statutory provision could qualify by 'possess[ing] the end, intention, or aim of adjusting, managing, or controlling the business of insurance.'" (second alteration in original) (quoting *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 505 (1993))).

[12] 393 U.S. 453, 460 (1969).

[13] *Id.*

[14] 508 U.S. at 505.

4

the purpose of regulating the business of insurance."[15] The Court held that it was: the statute "escape[d] pre-emption" because it was "'aimed at protecting or regulating' the performance of an insurance contract."[16] The Court emphasized that Congress, in enacting McCarran–Ferguson, made clear its "mission" to protect "continued regulation" by the states.[17] It observed that, even though "the Ohio statute does not directly regulate the 'business of insurance' by prescribing the terms of the insurance contract or by setting the rate charged by the insurance company," the "business of insurance" is not "confined entirely to the writing of insurance contracts, as opposed to their performance."[18] Accordingly, the Court concluded that "[t]here can be no doubt that the actual performance of an insurance contract falls within the 'business of insurance.'"[19] McCarran–Ferguson thus shields state laws that prescribe either the terms or the performance of insurance contracts.

The petitioners here—the Texas Division of Workers' Compensation and participating workers' compensation insurers—have a stronger case than the Ohio respondents in *Fabe*.

**B**

The Texas Workers' Compensation Act is a comprehensive regulatory structure for insurance carriers, employers, employees, health care providers, and others who claim benefits

---

[15] *Id.* at 493, 504 ("[W]e must decide whether a state statute establishing the priority of creditors' claims in a proceeding to liquidate an insolvent insurance company is a law enacted 'for the purpose of regulating the business of insurance,' within the meaning of § 2(b) of the McCarran–Ferguson Act."). The Supreme Court had only once before "had occasion to construe this phrase," in *National Securities*. *Id.* at 501.

[16] *Id.* at 493, 505 (quoting *Nat'l Sec., Inc.*, 393 U.S. at 460).

[17] *Id.* at 500 (quoting 15 U.S.C. § 1011).

[18] *Id.* at 502–03.

[19] *Id.* at 503.

under a workers' compensation policy.[20] "Insurance company" is a defined term. Under the Act, it "means a person authorized and admitted by the Texas Department of Insurance to do insurance business in this state under a certificate of authority that includes authorization to write workers' compensation insurance."[21] As we have recognized, "[i]n creating the Texas Workers' Compensation Act, the Legislature carefully balanced competing interests—of employees subject to the risk of injury, employers, and insurance carriers—in an attempt to design a viable compensation system, all within constitutional limitations."[22] Workers' compensation policies in Texas are, inherently, insurance; they are issued by private carriers, and those carriers in turn provide state-mandated coverage. Thus, "[t]he contract between a compensation carrier and an employee creates the same type of special relationship that arises under other insurance contracts"[23] And "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage."[24]

---

[20] Under the Act, an "insurance carrier" is "an insurance company." TEX. LAB. CODE § 401.011(27).

[21] *Id.* § 401.011(28).

[22] *In re Poly-Am., L.P.*, 262 S.W.3d 337, 352 (Tex. 2008) (orig. proceeding); *see also Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 448 (Tex. 2012) ("The 1989 reforms were intended to reduce the costs to employers and provide greater benefits to injured employees in a more timely fashion. Achieving those goals required, among other changes, reducing the disparity of bargaining power between the employee and insurer . . . ."). We further explained in *In re Poly-America*:

> The Texas Legislature enacted the original Workers' Compensation Act in 1913 in response to the needs of workers who, despite a growing incidence of industrial accidents, were increasingly being denied recovery. In order to ensure compensation for injured employees while protecting employers from the costs of litigation, the Legislature provided a mechanism by which workers could recover from subscribing employers without regard to the workers' own negligence, while limiting the employers' exposure to uncertain, possibly high damage awards permitted under the common law.

262 S.W.3d at 350 (citations omitted).

[23] *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 212 (Tex. 1988), *overruled on other grounds by Ruttiger*, 381 S.W.3d at 433.

[24] TEX. LAB. CODE § 408.001.

The Legislature has authorized the Texas Department of Insurance to oversee the workers' compensation system.[25] "Among the[] requirements [of the Texas Workers' Compensation Act] is the legislative directive that only workers' compensation policies approved by the Texas Department of Insurance are available in Texas."[26] A mainstay of the Act is that insurance carriers are "liable for compensation for an employee's injury without regard to fault or negligence," including state-prescribed medical benefits for covered employees who are injured on the job.[27] The Division regularly reviews insurers' records "to ensure compliance" with the Workers' Compensation Act and the commissioner's rules.[28] As part of this state-mandated system of insurance, insurance carriers and health care providers claiming reimbursement are heavily regulated.[29] By dictating the benefits that these insurance policies must afford, the Legislature regulates insurance policy terms. Participating insurance companies thus "contract to secure an

---

[25] *Id.* § 402.001(a). "The division of workers' compensation is established as a division within the Texas Department of Insurance to administer and operate the workers' compensation system of this state as provided by this title." *Id.* § 402.001(b).

[26] *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 658 (Tex. 2008). These state-approved policies are contracts between private insurance companies and employers; the employees of subscribing employers are the beneficiaries, and health care providers claim direct benefits under the policy. *See* TEX. LAB. CODE §§ 406.003, .051, 408.001. Though optional, the Act incentivizes employers to obtain coverage. *Id.* §§ 406.004 (requiring employers who do not obtain coverage to notify the Division), .007 (requiring notice of termination of coverage), .033 (forbidding an employer from using certain defenses in an action brought by an employee not covered by workers' compensation insurance). Similarly, though employees may opt out of coverage, it is disfavored. *See Port Elevator-Brownsville, L.L.C. v. Casados*, 358 S.W.3d 238, 241 (Tex. 2012); TEX. LAB. CODE § 406.034(b).

[27] TEX. LAB. CODE § 406.031(a).

[28] *Id.* § 414.004(a); *see also id.* § 414.002(a)(3) ("The division shall monitor for compliance with commissioner rules, this subtitle, and other laws relating to workers' compensation and the conduct of persons subject to this subtitle. Persons to be monitored include . . . insurance carriers.").

[29] *See, e.g.*, *id.* §§ 402.021(b)(8) ("It is the intent of the legislature that . . . the workers' compensation system of this state must . . . effectively educate and clearly inform each person who participates in the system as a claimant, employer, insurance carrier, health care provider, or other participant of the person's rights and responsibilities under the system and how to appropriately interact within the system."), 408.021(d) ("An insurance carrier's liability for medical benefits may not be limited or terminated by agreement or settlement."), 408.024 ("[T]he commissioner may relieve an insurance carrier of liability for health care that is furnished by a health care provider or another person selected in a manner inconsistent with the requirements of this subchapter."), 415.002–.003 (enumerating administrative violations by an "insurance carrier" and a "health care provider").

employer's liability and obligations and to pay compensation by issuing a workers' compensation insurance policy."[30] The "contract for coverage must be written on a policy and endorsements approved by the Texas Department of Insurance."[31] Accordingly, "[t]he terms of worker's compensation insurance policies include provisions of the worker's compensation statutes."[32]

Like the Workers' Compensation Act as a whole, the specific provisions challenged in this case regulate the business of insurance. These payment provisions require an insurance carrier to remit an amount determined by the Division under the coverage afforded.[33] An insurance carrier must remit this payment directly to a claimant like PHI Air Medical, LLC, the air-ambulance service provider in this case.[34]

As PHI Air concedes, the Workers' Compensation Act "governs payment for claims for health care providers—such as PHI—who provide services to workers' compensation patients." PHI Air has no contract with any workers' compensation insurance carrier. Rather, under the Act, PHI Air submits invoices to insurance carriers directly as *claims on insurance policies*. To facilitate uniform payments, the Division has adopted reimbursement rates. If no guideline exists for a particular service, the insurance carrier must reimburse the provider the Division's

---

[30] *Id.* § 406.051(a).

[31] *Id.* § 406.051(b); *see also* TEX. INS. CODE § 2052.002(a) ("The commissioner shall prescribe standard policy forms and a uniform policy for workers' compensation insurance.").

[32] *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 233 (Tex. 2010) (Johnson, J., concurring). State law may itself form a term of the insurance policy, incorporated by reference. *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 494 (5th Cir. 2006).

[33] *See* TEX. LAB. CODE § 413.011; 28 TEX. ADMIN. CODE §§ 134.1(a), (e)–(f), .203.

[34] TEX. LAB. CODE §§ 408.027(a) ("A health care provider shall submit a claim for payment to the insurance carrier . . . ."), 413.042 ("A health care provider may not pursue a private claim against a workers' compensation claimant for all or part of the cost of a health care service provided to the claimant by the provider unless: (1) the injury is finally adjudicated not compensable . . . ; or (2) the employee violates Section 408.22 relating to the selection of a doctor . . . .").

determination of a "fair and reasonable amount," consistent with section 413.011 of the Texas Labor Code.[35] Read separately and together, these provisions prescribe the benefits an insurance carrier must afford to a health-care-provider claimant, like PHI Air, which invokes the policy as a third-party beneficiary of the insurance contract.[36]

The Workers' Compensation Act thus is the foundation for every workers' compensation insurance policy issued in Texas.[37] Laws that "directly regulate the 'business of insurance'" include those that "prescrib[e] the terms of the insurance contract."[38] Through its provisions, the

---

[35] *See ante* at __. Section 413.011 directs the commissioner to "adopt health care reimbursement policies and guidelines that reflect the standardized reimbursement structures found in other health care delivery systems." TEX. LAB. CODE § 413.011(a). It provides that the "[f]ee guidelines must be fair and reasonable and designed to ensure the quality of medical care and to achieve effective medical cost control." *Id.* § 413.011(d). The rules specify that "'[m]aximum allowable reimbursement' . . . is defined as the maximum amount payable to a health care provider in the absence of a contractual fee arrangement that is consistent with § 413.011 of the Labor Code, and Division rules." 28 TEX. ADMIN. CODE § 134.1(a). Further, "fair and reasonable reimbursement" must:

(1) be consistent with the criteria of Labor Code § 413.011;

(2) ensure that similar procedures provided in similar circumstances receive similar reimbursement; and

(3) be based on nationally recognized published studies, published Division medical dispute decisions, and/or values assigned for services involving similar work and resource commitments, if available.

*Id.* § 134.1(f).

[36] *Ante* at __ ("Each insurance policy incorporates these laws and regulations, obligating the insurer to pay the benefits they require."); *see also* TEX. DEP'T OF INS., TEXAS WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY MANUAL, WORKERS' COMPENSATION & EMPLOYERS LIABILITY INSURANCE POLICY: WC 00 00 00 B (2d reprt. 2011), https://www.tdi.texas.gov/wc/regulation/documents/endform.pdf. The standard policy form states: "We will pay promptly when due the benefits required of you by the workers['] compensation law." *Id.* at Sec. B. It further provides: "This insurance conforms to the parts of the workers['] compensation law that apply to . . . benefits payable by this insurance." *Id.* at Sec. H.

[37] *See* TEX. LAB. CODE § 406.051(b) ("The contract for coverage must be written on a policy and endorsements approved by the Texas Department of Insurance."); *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 658 (Tex. 2008) ("[I]f the employer purchases workers' compensation insurance, the employer must adhere to the statutory and regulatory guidelines of the Workers' Compensation Act. Among these requirements is the legislative directive that only workers' compensation policies approved by the Texas Department of Insurance are available in Texas."); *see also Wausau Underwriters Ins. Co. v. Wedel*, 557 S.W.3d 554, 557 (Tex. 2018) (noting that the Department of Insurance has "promulgated and mandated [endorsements] for use in Texas workers'-compensation policies" and opining that the waiver at issue accordingly was "not freely negotiated by the parties" and "no ordinary policy").

[38] *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 502–03 (1993).

9

Act prescribes payment terms under workers' compensation policies, without reference to any separate contractual agreement. The reimbursement amount, and the formula for determining that amount, is part of every policy; it is the payment responsibility assumed by a private insurance company in the insurance contract. Unlike some other states, the Texas workers' compensation system operates through private insurance companies—there is no Texas workers' compensation without private insurance.[39] The "actual performance of an insurance contract" includes paying benefits under the policy, which is "an essential part of the 'business of insurance.'"[40]

Because Texas relies on private insurers, it is different from states in which a state fund pays out benefits. In *EagleMed LLC v. Cox*, the Tenth Circuit held that McCarran–Ferguson did not shield Wyoming's workers' compensation laws from preemption.[41] But Wyoming has "an industrial-accident fund—financed by [the non-insurance] industry and underwritten by the state."[42] The Tenth Circuit found this distinguishing feature critical, observing that it was "not persuaded" that the Wyoming statute "regulate[d] the business of insurance simply because *other states* have structured their workers' compensation programs to operate through private insurance companies."[43] The court did not view Wyoming's state fund as one that spread policyholder risk,

---

[39] *Ante* at __ ("In many States, a government entity acts as the employers' insurer, paying benefits to injured workers and reimbursing certain expenses they have incurred. In Texas, however, employers contract with private insurance carriers to perform these functions, and state laws and regulations define the insurers' obligations to reimburse health care providers for their services to covered workers." (citing TEX. LAB. CODE § 406.051)); *see also* TEX. LAB. CODE §§ 406.002 ("Except for public employers and as otherwise provided by law, an employer may elect to obtain workers' compensation insurance coverage."), .003 ("An employer may obtain workers' compensation insurance coverage through a licensed insurance company or through self-insurance as provided by this subtitle.").

[40] *Fabe*, 508 U.S. at 505.

[41] 868 F.3d 893, 905 (10th Cir. 2017).

[42] *Id.* at 897.

[43] *Id.* at 904 (emphasis added).

which the Supreme Court has held is an important feature of a law that regulates the "business of insurance."[44]

In contrast, the Texas Workers' Compensation Act specifies the coverage a private insurer must afford—and the payment of scheduled medical benefits—in exchange for the premium paid by employer-policyholders. The premium the insurance carrier charges participating employers is based on the coverage state law requires it to provide. If the coverage afforded under the policy increases, it follows that the premium charged to policyholders for that coverage will increase too.[45] PHI Air insists that the Workers' Compensation Act does not apply to it and, consequently, demands that it be paid more than the Division's regulations allow. But if insurance carriers must pay PHI Air more than state law requires (i.e., if the coverage under the policy is expanded to require a higher reimbursement amount than the state's mandated rate), then premiums must rise to reflect the change. Raising the premium is the way that the risk of increased claims cost is spread across all policyholders.

## III

## A

The Supreme Court's decisions in *Group Life & Health v. Royal Drug Co.* and *Union Labor Life Insurance Co. v. Pireno* do not support PHI Air's argument that McCarran–Ferguson does nothing to shield the Texas Workers' Compensation Act from federal encroachment.

---

[44] *Id.* at 905; *see also Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129–30 (1982); *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 213–14 (1979).

[45] Thus, the argument in *EagleMed* that no risk is underwritten or spread by Wyoming's laws and regulations is inapplicable. *EagleMed LLC*, 868 F.3d at 905.

In *Royal Drug*, the Supreme Court held that an insurer's third-party contracts with pharmacies were not part of the business of insurance exempt from federal antitrust laws.[46] The Court explained that those third-party agreements were ancillary to the promises made in insurance contracts because "policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies."[47] The Court observed that the pharmacy agreements were "legally indistinguishable from countless other business arrangements that may be made by insurance companies to keep their costs low and thereby also keep low the level of premiums charged to their policyholders."[48]

*Royal Drug* involved third-party agreements. In this case, however, the challenged payment terms are dictated by state law and the insurance policy itself. No similar state regulatory scheme was at issue in *Royal Drug*—the relationship between the pharmacies and the insurance company was not state-mandated, nor did *Royal Drug* involve claims brought under an insurance policy. Unlike the pharmacies in *Royal Drug*, PHI Air has no ancillary agreement with a private insurer that it seeks to enforce. And here, of course, PHI Air seeks to charge insurance carriers *more* than the amount afforded under state law and their insurance policies.

Further, *Royal Drug* examines McCarran–Ferguson's second clause, which exempts the "business of insurance" from antitrust regulation, not the first clause at issue in this case.[49] The second clause is a "narrow[]" exemption from antitrust laws.[50] In contrast, the first clause covers

---

[46] *Royal Drug Co.*, 440 U.S. at 210, 232–33.

[47] *Id.* at 214.

[48] *Id.* at 215.

[49] *Id.* at 210.

[50] *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982).

a "broad category of laws" that are "enacted 'for the purpose of regulating the business of insurance.'"[51] Recognizing this distinction, the Supreme Court later noted in *Fabe*, a first-clause case, that the first clause of McCarran–Ferguson's section 2(b) is "not so narrowly circumscribed":

> The language of § 2(b) is unambiguous: The first clause commits laws "enacted . . . for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from the antitrust laws. To equate laws "enacted . . . for the purpose of regulating the business of insurance" with the "business of insurance" itself . . . would be to read words out of the statute.[52]

In *Royal Drug*, the Court explained that "[t]he Pharmacy Agreements are not 'between insurer and insured.' They are separate contractual arrangements between [the insurance carrier] and pharmacies engaged in the sale and distribution of goods and services other than insurance."[53] Here, in contrast, the contractual arrangements between the covered employee, subscribing employer, insurance carrier, and medical provider claiming benefits under the policy are not "separate."

Like *Royal Drug*, the *Pireno* case also concerned section 2(b)'s antitrust clause and its application to third-party agreements not governed by insurance policies. In *Pireno*, the Supreme Court considered whether an outside peer-review committee that advised an insurer about charges for chiropractic services was "exempt from antitrust scrutiny as part of the 'business of insurance.'"[54] The Court held that the insurer's agreement with the peer-review service did not implicate the business of insurance because the peer-review process was "a matter of indifference

---

[51] *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 505 (1993).

[52] *Id.* at 504 (alterations in original). The Supreme Court "refuse[d]" to "read words out of the statute." *Id.*

[53] *Royal Drug Co.*, 440 U.S. at 216.

[54] 458 U.S. at 126.

to the policyholder, whose only concern is *whether* his claim is paid, not *why* it is paid."[55] In contrast, the payment provision that the air-ambulance service challenges here is a part of the insurance contract that is regulated by statute. There was no corresponding policy provision or state statute requiring peer review in *Pireno*. Instead, the insurers' private agreements with third parties were at issue.

Later, in *Fabe*, the Supreme Court clarified its holdings in *Pireno* and *Royal Drug*, observing that the cases "held only that 'ancillary activities' that do not affect performance of the insurance contract or enforcement of contractual obligations do not enjoy the antitrust exemption for laws regulating the 'business of insurance.'"[56]

**B**

*Pireno*, though not directly applicable to this case, outlined three "non-dispositive"[57] conditions for deciding, in a second-clause case, whether a "practice" pertains to the "business of insurance."[58] Courts should consider whether:

> (1) the practice has the effect of transferring or spreading a policyholder's risk; (2) the practice is an integral part of the policy relationship between the insurer and the insured; and (3) the practice is limited to entities within the insurance industry.[59]

---

[55] *Id.* at 132, 134.

[56] *Fabe*, 508 U.S. at 503.

[57] *Fredericksburg Care Co. v. Perez*, 461 S.W.3d 513, 521 (Tex. 2015).

[58] *Pireno*, 458 U.S. at 129.

[59] *Fredericksburg*, 461 S.W.3d at 521 (quoting *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590–91 (5th Cir. 1998)); *see also Pireno*, 458 U.S. at 129. In *Fredericksburg*, we held that a law relating to agreements to arbitrate health care liability claims under the Texas Medical Liability Act was not enacted "for the purpose of regulating the business of insurance." 461 S.W.3d at 528. Unlike the Texas Workers' Compensation Act, the law at issue in that case has "no bearing on whether a claim is paid or coverage is denied, nor does it prescribe the terms of insurance contracts or set the rates that insurance companies can charge." *Id.* at 525. In contrast, the Workers' Compensation Act mandates the "type" of policy that must be issued and payments that a carrier is obligated to make under the policy. Establishing an insurance framework is not central to the Medical Liability Act. "Insurance carrier" and "insurance company" are not even defined terms. *See* TEX. CIV. PRAC. & REM. CODE § 74.001.

Applying these conditions to a state statute (not an insurance "practice"), does not change the result.[60] As the Supreme Court later recognized in *Fabe*, a regulation directed toward the "performance" of an insurance contract satisfies the *Pireno* test.[61] An insurance company's payment to PHI Air is *performance* of a central policy obligation—the payment of medical benefits under the policy.

The Texas Workers' Compensation Act's reimbursement provisions dictate an insurers' payment obligations for claims brought under the policy, thereby defining the medical losses that the insurer agrees to cover for its employer policyholders. The costs of these covered claims are spread over all policyholders through an insurance premium charged to employer policyholders (whether or not they have asserted a claim). Because the reimbursement provisions that PHI Air challenges define the scope of the coverage afforded for claims made under the policies, those provisions are integral to the policy relationship. And because the reimbursement provisions spread an individual policyholder's risk associated with liability for an individual employee's injury to all who participate in the system, they transfer a policyholder's risk to the pool of policyholders. The insurance carriers cover that risk in the amount dictated by state law.[62]

---

[60] We applied the *Pireno* factors in *Fredericksburg* to assist with our analysis of McCarran–Ferguson's first clause, noting that they were "non-dispositive." 461 S.W.3d at 521.

[61] *Fabe*, 508 U.S. at 503–04.

[62] In *Genord v. Blue Cross & Blue Shield of Michigan*, the Sixth Circuit held that McCarran–Ferguson did not shield Blue Cross from a federal civil RICO claim. 440 F.3d 802, 803, 809 (6th Cir. 2006). In *Genord*, doctors sued to enforce their third-party billing agreements with Blue Cross, alleging that Blue Cross "systematically denied" payments, as the agreements required. *Id.* at 804. Relying on *Royal Drug*, the Sixth Circuit held that these third-party billing agreements did not have the "aim of regulating a practice that has the effect of transferring or spreading policyholder risk" and thus were ancillary to the policy relationship. *Id.* at 806, 808. The Sixth Circuit instead characterized the provisions as merely regulating "billing-code invoicing arrangement[s] with health care providers." *Id.* at 808. Unlike the doctors in *Genord*, PHI Air does not seek to enforce a third-party agreement, nor does it allege that an insurer has failed to perform under a third-party agreement. To the extent a reimbursement rate is mandated by Texas law as part of the coverage afforded under the policy, it is an integral part of an insurance policy.

The challenged reimbursement regulations reach insurers, employer policyholders, employees, and those directly claiming statutory benefits under the policy of insurance (medical providers). The regulatory framework governs the various aspects of the intertwined relationships among those parties. The Act thus meets *Pireno*'s "non-dispositive" factors.

**IV**

Ultimately, the air-ambulance service provider in this case seeks the relatively secure direct payment of *insurance policy benefits* in lieu of attempting to collect from the users of its services in the private marketplace. As PHI Air concedes, it directly billed insurers under their insurance policies and seeks payment under the coverage afforded. By opportunistically relying on the Airline Deregulation Act, PHI Air seeks to benefit from federal preemption without the market forces of deregulation, and from direct payment for its services without the state regulations that constrain all others who seek payments under workers' compensation policies. In other words, PHI Air charges and claims insurance benefits under the Workers' Compensation Act like a health care provider, not like the air-taxi service that purportedly brings it within the Airline Deregulation Act.

It was this intrusion into state insurance regulation by unrelated federal laws that Congress stopped. Because the McCarran–Ferguson Act shields the Texas Workers' Compensation Act's insurance provisions from federal preemption, it is appropriate that we reverse and remand. I therefore respectfully concur.

_____
Jane N. Bland
Justice

OPINION DELIVERED:  June 26, 2020

16